12595

DUNN v. CHAPMAN *ET AL.*

(146 S. E., 818)

164

*Messrs. Jas. P. Carey, Jr., W. C. Hughs,* and *B. A. Chapman,* for appellants,

*Messrs. Mann & Plyler,* and *Robinson & Mann,* for respondent,

February 18, 1929.

The opinion of the Court was delivered by MR. JUSTICE COTHRAN.

We think that the decree of his Honor Judge Bonham, overruling the demurrer of the defendants to the plaintiff's complaint, should be affirmed for the reasons which follow.

The facts alleged in the complaint and admitted by the demurrer are these:

On January 5, 1921, the plaintiff bought from one Gilstrap a tract of land containing 55.8 acres. He paid a part of the purchase price, and gave his note for $3,240.67, secured by a mortgage of the tract for the remainder. At the maturity of the note, Dunn borrowed from the Federal Land Bank $1,600, and from the Liberty Bank $1,995.42, $3,595.42 in all, with which to meet his note. The notes secured by mortgages upon the tract to these two banks were dated respectively January 16, 1922, and February 27, 1922; with their proceeds Dunn paid off the Gilstrap note and mortgage, and had the mortgage marked satisfied. (Why he needed $3,595.42 to meet a note of $3,240.67 which had run a little over a year, the interest upon which, even at 8 per cent., would not have amounted to more than $285, is not explained.) Later and before the maturities of the two mortgages given to the banks, Dunn reconveyed to Gilstrap

27.5 acres of the 55.8-acre tract, the consideration therefor being the assumption by Gilstrap of one-half of the Federal Land Bank mortgage $1,600, $800, and the whole of the Liberty Bank mortgage $1,995.42 (I assume with unpaid interest). Dunn and Gilstrap went to the Liberty Bank on February 28, 1922, explained to the cashier the trade between them, and had him to prepare a deed from Dunn to Gilstrap of the 27.5 acres, possession of which was surrendered to Gilstrap. Thereafter on February 17, 1923, Gilstrap executed a note to the Liberty Bank (the amount not appearing), and secured it by a mortgage upon the 27.5-acre tract conveyed to him by Dunn. On December 17, 1923, Gilstrap conveyed the 27.5-acre tract to the Liberty Bank, it is assumed in payment of his note and mortgage of February 17, 1923. Gilstrap has paid nothing upon his obligation to pay one-half of the Federal Land Bank mortgage and all of the Liberty Bank mortgage, as the consideration of the conveyance by Dunn to him of the 27.5 acres, and has left the State, leaving Dunn responsible alone for both the $1,600 Federal Land Bank mortgage and the $1,995.42 Liberty Bank mortgage. Upon the insistence of the Liberty Bank and to save the remaining 28.3 acres of the original 55.8-acre tract, Dunn paid to the Liberty Bank the whole of the $1,995.42 mortgage with accumulated interest up to December 31, 1925, at which time the Liberty Bank canceled and had marked satisfied of record the $1,995.42 mortgage. The Liberty Bank surrendered the note to Dunn, but retained the mortgage, and refuses to deliver it to Dunn.

The present action was instituted by Dunn who, alleging the facts substantially detailed above, asked for the following remedies: (1) That he be allowed to redeem the 27.5 acres, I assume upon the payment of the note of Gilstrap to the Liberty Bank; (2) that the deed from him to Gilstrap be declared a conditional sale, dependent upon the payment by Gilstrap of one-half of the Federal Land Bank mortgage and all of the Liberty Bank mortgage; that the failure of

Gilstrap to perform the same rendered said conveyance void, and entitled him to a reconveyance of the 27.5 acres; (3) that failing in these two remedies he be declared subrogated to the rights of the Liberty Bank in the $1,995.42 mortgage which he has paid.

The defendants interposed a demurrer to the complaint upon the general ground with specifications, which appear in the written demurrer, which will be reported. The demurrer came on to be heard by his Honor, Judge Bonham, who, on October 19, 1927, filed an order which bears evidence of earnest and intelligent consideration, and exceedingly logical conclusions.

We need not advert to the first and second remedies sought by the plaintiff, which are satisfactorily disposed of by the learned Circuit Judge. The crucial issue in the case, as to the solution of which the Circuit Judge and Mr. Acting Associate Justice Ramage are at variance, is whether the facts outlined entitle the plaintiff to be subrogated to the rights of the Liberty Bank in the $1,995.42 mortgage which he has paid, and the interesting question as to the extent of that subrogation, in the event that the general issue be determined in favor of the plaintiff.

In the opinion of Mr. Justice Ramage, it is correctly stated that no issue of fraud by, or collusion between, the Liberty Bank and Gilstrap is raised by the pleadings, and his observations in reference thereto are without criticism, except that the real issue in the case, subrogation, is not at all affected, one way or the other, by the presence or absence of any such issue.

The opinion declares: "Under the clearly established law in this State, subrogation cannot be set up by one who has simply paid his own note, as was done by the plaintiff in the case at bar. Plaintiff was primarily liable and no amount of argument can get us away from that fact. There is no escaping the conclusion that plaintiff was simply paying his own

note and mortgage, and no amount of sophistry can wipe this fact out of the case."

There can be no doubt of the proposition that equity will deny the right of subrogation to one who pays or has paid a debt for which he was *at the time* primarily liable. That has been thoroughly settled by many cases. The doctrine can be invoked only by one who has paid a debt for which he was at the time secondarily liable, in relief of his own property upon which such debt was a lien.

The opinion assumes as a fact that Dunn, *at the time* he paid the Liberty Bank $1,995.42 mortgage, was primarily liable to the bank therefor. The facts of the case do not warrant this assumption. The test is not whether or not Dunn *originally* was primarily liable for the mortgage debt; but whether or not *at the time he paid it off* he was primarily or secondarily liable. As to that issue, we cannot see any room for doubt. Of course, at the time that the debt was contracted Dunn was primarily and solely liable for it; he had bought the land from Gilstrap; given him a mortgage for the balance of the purchase price; the mortgage was due or about to become due; he borrowed the money from the Liberty Bank for the purpose of paying off the mortgage; and executed his note and mortgage therefor. No one else was interested in that transaction, and of course Dunn was then the only and primary debtor. But subsequent events put an entirely different light upon his relation to the debt.

A striking illustration of the change of the relation of a debtor, from that of the primary obligor to that of the secondary obligor, is found in the case of *Beattie v. Latimer,* 42 S. C., 313, 20 S. E., 53. In that case Irvine & Mooney, attorneys of the Greenville bar, had represented Hewlett Sullivan in many legal matters; they had difficulty in collecting their fees from him; needing money they borrowed from Beattie $1,000 upon their personal note signed also by Hewlett Sullivan *as surety*. After the death of Hewlett

Sullivan, Irvine & Mooney had a settlement with the executors of Sullivan in which the estate was credited with the $1,000 note upon condition that the executors would assume its payment. Thus Irvine & Mooney, who were the primary obligors, and Hewlett Sullivan, the secondary obligor, reversed positions upon the note, the executors becoming the primary, and Irvine & Mooney the secondary obligors, and, in the action by Beattie against all of them, Beattie was allowed judgment against all, but the rights of Irvine & Mooney, as secondary obligors, were protected by requiring Beattie to exhaust the executors before going upon Irvine & Mooney.

The principle of subrogation is discussed at length in the cases of *Prudential Co. v. Connor*, 120 S. C., 42, 12 S. E., 539; *Walker v. Queen Ins. Co.*, 136 S. C., 144, 134 S. E., 263, 52 A. L. R., 259; *Enterprise Bank v. Federal Land Bank*, 139 S. C., 397, 138 S. E., 146; see, also, *Sutton v. Sutton*, 26 S. C., 33, 1 S. E., 19, *Rivers v. Bank*, 135 S. C., 107, 133 S. E., 210; the authorities cited in those cases need not be repeated here. In the final precipitation of the matter it has been settled by these and other cases that the essential elements of the right of subrogation are: (1) That the party claiming it has paid the debt; (2) that he was not a volunteer, but had a direct interest in the discharge of the debt or lien; (3) that he was secondarily liable for the debt or for the discharge of the lien; (4) that no injustice will be done to the other party by the allowance of the equity.

We think that the facts show that Dunn has supplied every one of these essential elements.

As the learned Circuit Judge observes, the case of *Walker v. Queen*, 136 S. C., 144, 134 S. E., 263, 52 A. L. R., 259, is precisely in point. It is there held that, where a mortgagor (Dunn) conveys the mortgaged premises upon the assumption by the grantee (Gilstrap) of such mortgage, "the premises become the primary fund out of which the mortgage is collectible," regardless of the acquiescence of

the mortgagee in that arrangement, and *"the mortgagor (Dunn) then becomes secondarily liable for the mortgage debt."* This is the precise situation presented in the case at bar.

Therefore, as Dunn has paid the debt, had a direct interest in taking up the mortgage as a lien upon all of the tract, was secondarily liable for the debt, and no injury will result to the bank by the allowance of the equity, it should be allowed. Certainly the bank has no right to complain. As the Circuit Judge pertinently observes: "Dunn's equity is heightened by the fact that the bank knew of the arrangement between Dunn and Gilstrap."

Upon the admitted facts, we think that the plaintiff is entitled to enforce the $1,995.42 mortgage against the 27.5 acres conveyed by him to Gilstrap, subject, of course, to prior liens, but not subject to the mortgage of Gilstrap to the bank, or to his subsequent conveyance to it.

Of course, our observations have been made upon the assumption, justified by the demurrer, that the facts stated in the complaint are true. This assumption is subject to the establishment of them upon the trial.

The decree of the Circuit Judge, in our opinion, should be affirmed in all matters consistent with the foregoing, and it is so ordered.

MESSRS. JUSTICES BLEASE and STABLER concur.

MR. ACTING ASSOCIATE JUSTICE RAMAGE (dissenting): The complaint which is the subject of this appeal is as follows:

### "AMENDED COMPLAINT

"The amended complaint of the above-named plaintiff, by leave of the Court had and obtained, respectfully shows to the Court:

"1. That the plaintiff is a resident and citizen of the county and state aforesaid, and on information and belief he alleges that the defendant H. M. Chapman and J. M.

Abbott have been appointed and are now acting as receivers of Liberty Bank, a corporation created and existing under the laws of this State, with its principal place of business at Liberty, in the County and State aforesaid; and on information and belief plaintiff further alleges that G. R. Gilstrap, a former defendant in this action, died intestate at his home in the State of Alabama on the 2nd of July, 1926, after the commencement of this action, leaving surviving him as heirs at law and distributees all the defendants named above, except the receivers, the first named Lizzie Gilstrap being his widow and the others his children, some of whom plaintiff believes are minors but as to which ones he is not informed. The plaintiff further alleges on information and belief that the said G. R. Gilstrap left no estate and there has been no administration.

"2. That on the 5th day of January, 1921, the plaintiff purchased from G. R. Gilstrap a tract of land situated in the County and State aforesaid, containing 58.8 acres, but by a survey thereafter made was found to contain 55.6 acres, and took a deed of conveyance thereto which reference is hereby made recorded in Book III, page 18; and on the same day the plaintiff executed and delivered to the said G. R. Gilstrap his note and a mortgage covering said tract of land in the sum of $8,240.37 to secure the balance of the purchase money due thereon to which reference is also made as shown recorded in Book 33, page 314.

"3. That in order to pay and settle the said mortgage debt to the G. R. Gilstrap the plaintiff procured a loan from the Federal Land Bank in the sum of $1,600.00 and a further loan from defendant Liberty Bank $1,995.42, and in order to secure the payment of said sum the plaintiff on the 16th day of January, 1922, executed and delivered to said Federal Land Bank his note and a mortgage of the said 55.6 acres of land to which reference is hereby made as recorded in Book V. V., page 107, and on the 27th day of February, 1922, executed and delivered to the Liberty Bank his other

note and mortgage of the said 55.6 acres of land to which reference is hereby made as shown recorded in Book W. W., page 103, and the sums so obtained from these two banks were used and applied in full payment and satisfaction of the mortgage debt to Gilstrap referred to in Paragraph two hereof, whereupon said Gilstrap canceled the record of said mortgage.

"4. That soon after the execution of the mortgages referred to in the last paragraph above negotiations between the plaintiff and said Gilstrap culminated in an agreement whereby the plaintiff agreed to convey to the said Gilstrap one-half or 27.5 acres of said tract of land upon the promise and agreement that the said Gilstrap would assume and pay one-half of the $1,600 to the Federal Land Bank and all of the $1,995.42 to the Liberty Bank with interest on each of said sums; and in order to carry out their agreement the plaintiff and the said Gilstrap on the 28th day of February, 1922, went to the Liberty Bank, at Liberty, S. C., and after explaining their agreement to C. E. Bush, the cashier of said bank, requested said Bush to prepare a deed which he did and which the plaintiff signed and the same was delivered to the said Gilstrap, which deed conveyed one-half or 27.5 acres of the said tract of land first above referred to, and which deed is recorded in Book LLL, page 203, to which reference is hereby made.

"5. That hereafter, to wit, on the 17th day of February, 1923, the said Gilstrap further incumbered the said tract of 27.5 acres of land by giving to the defendant Liberty Bank a mortgage thereon as appears by the record thereof as shown in Book XX, page 8; and later, to wit, on the 17th day of December, 1923, the said Gilstrap executed and delivered to the said Liberty Bank a deed of conveyance to the said 27.5 acres of land as appears by the record thereof in Book GGG, page 137.

"6. That the said Gilstrap failed to keep and perform his agreement as set forth in the fourth paragraph hereof where-

by he promised and agreed to pay and discharge the mortgage debts therein stated, but as plaintiff is informed and believes soon after making the deed conveying the 27.5 acres to the Liberty Bank as set forth in the last paragraph above he left the State and has not at any time paid any part of said debts; on the contrary upon the insistence, and at the instance and request of Liberty Bank, and believing that the same was necessary to protect, release and save the other half of said tract of land from sale under said mortgages the plaintiff paid to said bank the said sum of $1,995.42 with all accrued interest thereon and has each year since 1922 paid to the Federal Land Bank the annual payments due to said bank as each matured with interest thereon, and after final payment had been made to the said Liberty Bank on the $1,995.42 mortgage the cashier of said Bank, C. E. Bush, on December 31, 1925, canceled and marked satisfied the record of said mortgage and delivered to the plaintiff the note which it secured but refused to deliver the said mortgage.

"7. That the defendants H. M. Chapman and J. M. Abbott, as receivers of said Liberty Bank, are in possession of the said 27.5 acres of land and claim to own and hold the same by virtue of the said deed of conveyance of G. R. Gilstrap, but plaintiff alleges that said defendants cannot so hold said land and also retain the use and benefit of the money paid by plaintiff on its mortgage debt; that the deed of conveyance by the plaintiff under the agreement with the defendant Gilstrap amounted in law to a conditional sale of which bank had notice, and the said Gilstrap having failed to perform his said agreement the said deed as well as that of the said Gilstrap to the said bank are null and void; that the plaintiff had such equity in the said 27.5 acres of land as entitled him to redeem and have the said tract of land reconveyed to him or he is entitled to be subrogated to the rights of said bank under said mortgage.

"Wherefore the plaintiff prays:

"First. That he be permitted and allowed to redeem the said tract of 27.5 acres of land and that the defendants, as Receiver, be required to re-convey the same to him.

"Second. Failing in this that the mortgage for $1,995.42 be foreclosed and the plaintiff subrogated to the rights of the bank for the amount of said debt paid by the plaintiff with interest and costs and attorney's fees and that the deeds made by the plaintiff to said Gilstrap and by said Gilstrap to Liberty Bank be declared void and delivered up to be canceled.

"Third. And for such other and further relief as to the Court may seem meet and just."

We next quote a portion of Judge Bonham's order, in which he overrules the demurrer.

"This is an action by James Dunn against Chapman and Abbott as Receivers of Liberty Bank, and the other defendants as the widow and children and heirs at law of G. R. Gilstrap, a former defendant in the case who has died since the commencement of the action. The matter came before me at Pickens at October, 1927, term of Court of Common Pleas on a demurrer to the complaint and decision reserved.
\* \* \*

"Defendant, Liberty Bank, demurs to the complaint on the ground that it does not state facts sufficient to constitute a cause of action, because it appears on the face of the complaint that all the transactions complained of were regular and in the ordinary course of business; that Gilstrap, having a deed to the land and being in possession, had a right to give to the Bank a mortgage and had the right to convey the premises to the Bank in payment of the debt, and the Bank had the right to accept the mortgage and deed; that there is no allegation in the complaint of fraud, nor of collusion bewteen Gilstrap and the Bank; that this sale by Dunn to Gilstrap was not a conditional sale, but was a direct sale in fee simple; that plaintiff has no right of subrogation in the premises.

"The case is an interesting one and has engaged my earnest attention and consideration.

"Clearly this is not a conditional sale; it has none of the elements of such sale. A conditional sale is one in which the transfer to title to the buyer, or his retention of it, is made dependent upon the performance of some condition. The term is used in this country most frequently with reference to that class of cases where the seller reserves, or retains the title—though the possession is delivered to the buyer—until some condition is performed, usually the payment of the purchase money. 24 R. C. L., 739.

"Here is no reservation save the contract to pay, which is the necessary incident of every sale. The buyer was given a deed in fee simple, and put in possession of the premises upon his assumption of the mortgage debts; he thus became the absolute owner of the land in fee, and the seller relied upon his promise to pay. There is not here any incident of a conditional sale."

An inspection of the complaint will show that plaintiff relies first on the idea of a conditional sale, or, failing in that, on subrogation. There are no allegations of fraud or collusion on the part of the Liberty Bank. Fraud must be alleged, in order to be invoked in any case.

Mr. Justice Watts, following a long line of decisions in our State and elsewhere, has this to say about pleading fraud in the case of *Donaldson v. Temple,* 96 S. C., at page 242, 80 S. E., 438:

" 'But where the acts set forth in a bill in equity do not themselves constitute fraud, charges that the acts set forth are fraudulent do not present sufficient grounds of equity jurisdiction.' 9 Ency. of P. and P., 695; *Van Weel v. Winston,* 115 U. S., 228 [6 S. Ct., 22, 29 L. Ed., 384].

" 'Whether the fraud be alleged in the declaration, complaint or bill, or set up by way of defense in pleas, answer or replication, it is essential that the facts and circumstances which constitute it should be set out clearly, concisely and

with sufficient particularity to apprise the opposite party of what he is called upon to answer.' *State v. Jaques,* 65 S. C., 184, 43 S. E., 515; *Gem Chemical Co. v. Youngblood,* 58 S. C., 56, 36 S. E., 437.

"Nowhere in the complaint do we find any general or special allegation of fraud. There was no allegation that the defendant was overreached or deceived. By the allegation of the complaint the defendant was advertised that he would have to answer a cause of action for recklessness, wilfulness, and wantonness, not one for deceit and fraud. We do not think under the pleadings in this case that there was any allegation of fraudulent breach of contract and that being the case no punitive damages could be recovered. *Prince v. Insurance Co.,* 77 S. C., 192, 57 S. E., 766."

In view of the authorities, we do not see how plaintiff can stand on any ground in the complaint save either *conditional sale* or *subrogation.*

His Honor Judge Bonham has very clearly and completely disposed of the position as to conditional sale, and his views thereon are perfectly satisfactory to this Court.

The above quotation from the opinion of Mr. Justice Watts shows very conclusively that no fraud or collusion has been set up in the complaint; and it only remains to consider whether or not a proper case of subrogation had been set out in the complaint.

Under the clearly established law in this State, subrogation cannot be set up by one who has simply paid his own note, as was done by the plaintiff in the case at bar. Plaintiff was primarily liable, and no amount of argument can get us away from that fact. There is no escaping the conclusion that plaintiff was simply paying his own note and mortgage, and no amount of sophistry can wipe this fact out of the case. *McLure v. Melton,* 34 S. C., 377, 13 S. E., 615, 13 L. R. A., 723, 27 Am. St. Rep., 820; *Breedin v. Smith et al.,* 126 S. C., 346, 120 S. E., 64; *Walker v. Queen Ins. Co.,* 136 S. C., 144, 134 S. E., 263, 52 A. L. R., 259; 37 Cyc.,

374; *Gadsen v. Brown*, Speers Eq., 37. Such being the case plaintiff cannot stand on subrogation and his complaint must necessarily fall.

It will not do to confuse Gilstrap's liability, so far as Dunn is concerned, to Dunn with the liability of Dunn, so far as the Liberty Bank is concerned. In other words, there is no allegation that Liberty Bank agreed to substitute Gilstrap for Dunn on the note, or to look to Gilstrap primarily for the payment of the note and mortgage. The complaint alleges: " * * * Went to the Liberty Bank at Liberty, S. C., and after explaining their agreement to C. E. Bush, cashier of said Bank, requested said Bush to prepare a deed which he did." Not a word in there that the bank agreed to any change or modification of its note and mortgage signed by Dunn. No matter what relationship subsisted between Gilstrap and Dunn, between Dunn and the Liberty Bank there was no change, and that is what we are concerned with here. Dunn's primary liability to the Liberty Bank continued up to the time he paid off his note and mortgage.

The judgment of this Court should be that the order of the Circuit Judge overruling the demurrer be reversed; that the demurrer be sustained, and the complaint dismissed.

Mr. Chief Justice Watts concurs.